UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF NORTH CAROLINA
DURHAM DIVISION

IN RE:                          )
                                )
Charles Douglas Evans,          )        Case No. 10-80446C-13D
                                )
        Debtor.                 )
                                )

## MEMORANDUM OPINION

This case came before the court on July 8, 2010 for a hearing regarding confirmation of the Debtor's proposed chapter 13 plan of reorganization.  Terry D. Fisher appeared on behalf of the Debtor and Benjamin E. Lovell appeared on behalf of the chapter 13 trustee, Richard M. Hutson, II.

### JURISDICTION

The court has jurisdiction over the subject matter of this proceeding pursuant to 28 U.S.C. §§ 151, 157, and 1334, and the General Order of Reference entered by the United States District Court for the Middle District of North Carolina on August 15, 1984. The matter before the court is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(L) which this court may hear and determine.

### FACTS

It is undisputed that the Debtor has equity in his residence that greatly exceeds the aggregate amount of the unsecured claims in this case.  As a result, the Debtor proposes in his plan to pay his unsecured creditors 100% of their allowed claims.  The Debtor proposes to make such payment by means of monthly payments spread

over a period of thirty-six consecutive months.  The unresolved issue is the interest that must be provided for unsecured creditors in order for the plan to comply with the best-interest-of-creditors test embodied in section 1325(a)(4) of the Bankruptcy Code.

ANALYSIS

1.  Pre-confirmation interest

The amount that unsecured creditors must receive in order for a plan to comply with section 1325(a)(4)[1] must have a value as of the effective date of the plan at least equal to the amount that unsecured creditors would be paid "if the estate of the debtor were liquidated under chapter 7 . . . ."  The application of this test first requires a hypothetical chapter 7 liquidation of the debtor's estate.  This exercise involves determining the assets that would remain in the estate after giving effect to the exemptions available to the debtor and determining the net proceeds that would remain after liquidating those assets and satisfying any liens on the assets, any priority claims and the allowable expenses and

---

[1]Section 1325(a)(4) provides that:

> the value, as of the effective date of the plan, of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under chapter 7 of this title on such date . . . .

chapter 7 costs of administrative that would be associated with the liquidation.  See 11 U.S.C. § 726(a).

Such a hypothetical liquidation in the present case reflects a very favorable outcome for unsecured creditors.  The fair market value of the Debtor's residence is scheduled at $163,231.  The residence is subject to a single deed of trust securing an indebtedness of $19,623.  The Debtor has claimed the available homestead exemption of $35,000.  There are no priority claims or other amounts that would reduce the net sale proceeds from the residence other than expenses and cost of administration which will be estimated at 10% of the sales price or $16,323.  These figures indicate that a hypothetical chapter 7 liquidation in this case would yield net proceeds of $92,285.  Since the total unsecured claims in this case are a little less than $43,000, the net proceeds are more than required in order to pay 100% to the holders of unsecured claims.

One further step is required in this case in order to determine the amount that would be paid to unsecured creditors in a hypothetical chapter 7 liquidation.  In a chapter 7 case, distribution of property of the chapter 7 estate is controlled by section 726 of the Bankruptcy Code.  Section 726(a)(5) provides for "the payment of interest at the legal rate from the date of the filing of the petition, on any claim paid under paragraph (1), (2), (3), or (4) of this subsection . . . ."  Where estate funds remain

- 3 -

after the payment of unsecured claims, section 726(a)(5) requires that interest at the legal rate be paid to unsecured creditors before any funds are turned over to the debtor pursuant to section 726(a)(6). See In re Hoskins, 405 B.R. 576, 587 (Bankr. N.D. W.Va. 2009). Because a chapter 7 liquidation in this case would produce more than required to pay unsecured creditors in full, section 726(a)(5) is applicable in determining the amount unsecured creditors would be paid in a chapter 7 liquidation. This means that the amount that would be paid to unsecured creditors includes interest on their claims at the "legal rate" from the petition date to the effective date of the plan. See In re Cook, 322 B.R. 366, 340 (Bankr. N.D. Ohio 2005)("Section 726(a)(5) deals with pendency interest—interest accruing after the commencement of the case but before the effective date of the plan."). The final element in determining the amount that would be paid in a chapter 7 liquidation is the meaning of "legal rate" as used in section 726(a)(5). While the cases are not entirely consistent, this court believes that the sounder view is that as used in section 726(a)(5), the "legal rate" refers to the federal statutory rate for interest on judgments set by 28 U.S.C. § 1961.[2]    In re

---

[2]Section 1961 provides that "interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment" and "shall be computed daily to the date of payment except as provided in section 2516(b) of this title and section 1304(b) of title 31,

Cardelucci (Onink v. Cardelucci), 285 F.3d 1231 (9th Cir. 2002); In re Country Manor of Kenton, 254 B.R. 179 (Bankr. N.D. Ohio 2000); In re Dow Corning Corp., 237 B.R. 380 (Bankr. E.D. Mich. 1999); In re Chiapetta, 159 B.R. 152 (Bankr. E.D. Pa. 1993); In re Melenyzer, 143 B.R. 829 (Bankr. W.D. Tex. 1992). See generally 6 Collier on Bankruptcy ¶ 726.02[5] (15th ed. rev. 2010).

The date on which the applicable federal judgment rate is to be determined for purposes of section 726(a)(5) is the federal judgment rate in effect on the petition date. In re Melenyzer, 143 B.R. at 833; see also In re Parke, 369 B.R. 205, 209 (Bankr. M.D. Pa. 2007) (using judgment rate as of date of the petition); In re Best, 365 B.R. 725, 727 (Bankr. W.D. Ky. 2007) (Legal rate "mean[s] the federal judgment interest rate at the date the petition is filed."); In re Chiapetta, 159 B.R. at 161 ("[W]e further conclude that, since a claim is like a judgment entered at the time of the bankruptcy filing, the applicable rate should be the federal judgment rate in effect at the time of the bankruptcy filing.").

The federal judgment rate in effect on the petition date in this case was 0.34%. Consequently, the amount that unsecured creditors would be entitled to receive if the estate of the Debtor were liquidated under chapter 7 is 100% of their allowed claims plus interest at the rate of 0.34% per annum from the petition date to the effective date of the plan.

---

and shall be compounded annually."

- 5 -

If the Debtor's plan proposed a lump sum payment to unsecured creditors on the effective date, the plan would comply with section 1325(a)(4) and would be confirmable. However, instead of an immediate lump sum payment, the plan proposes deferred monthly payments spread over a period of thirty-six consecutive months.

### 2. Post-confirmation interest

Under section 1325(a)(4), it is not enough that the sum total of deferred payments offered the unsecured creditors is equal to the amount the creditor would have received in a chapter 7 liquidation. E.g., In re Hardy (Hardy v. Cinco Fed. Credit Union), 755 F.2d 75 (6th Cir. 1985). Instead, "[s]ection 1325(a)(4) dictates that the chapter 13 plan offer the holder of each allowed unsecured claim property, including deferred payments, of a present value not less than the liquidation value of such claim." 8 Collier on Bankruptcy ¶ 1325.05[2][b] (16th ed. 2010). The concept of present value is based upon the recognition that a dollar in hand today is worth more than a dollar due some time in the future. The difference between these two values is referred to as the time value of money. Lost opportunity to put the money to profitable use, the possibility of inflation, and the risk of non-payment explain this difference in value. Present value analysis involves an attempt to compensate for the time value of money, i.e., compensate for the delay in receiving payment. The present value calculation is a mathematical exercise which takes into

- 6 -

account the magnitude of future income streams, as well as their timing. The discount rate used to reduce these future income streams to present value can be utilized in a bankruptcy context as an interest rate to ensure payment of the present value of a principal balance over time. See generally In re Plascencia, 354 B.R. 774, 782-83 (Bankr. E.D. Va. 2006); In re Birdneck Apt. Assoc. II, L.P., 156 B.R. 499, 507 (Bankr. E.D. Va. 1993); and 8 Collier on Bankruptcy at ¶ 1325.05[2][b].

While the use of interest to ensure payment of the present value of a claim is a generally accepted practice, determination of that interest rate has been a frequent issue of dispute. See In re Scott, 248 B.R. 786, 789 (Bankr. N.D. Ill. 2000)(determining present value interest rate is "arguably the most debated economic issue in bankruptcy litigation"). Over the years, courts have devised a number of methodologies for selecting an interest rate when called upon to make a present value determination. These methodologies have included the coerced loan approach, the presumptive contract rate approach, the cost of funds approach and the formula approach. In Till v. SCS Credit Corp., 541 U.S. 465 (2004), the Supreme Court took up the issue of the proper method of selecting an interest rate sufficient to pay present value to secured creditors under section 1325(a)(5)(B)(ii) of the Bankruptcy Code. A plurality of the Court considered and rejected the coerced loan, presumptive contract rate, and cost of funds approaches, and

instead settled on a formula approach.    The formula approach
adopted by the Court was described as follows:

> Taking its cue from ordinary lending
> practices, the [formula] approach begins by
> looking to the national prime rate, reported
> daily in the press, which reflects the
> financial market's estimate of the amount a
> commercial bank should charge a creditworthy
> borrower to compensate for the opportunity
> costs of the loan, the risk of inflation, and
> the relatively slight risk of default.
> Because bankruptcy debtors typically pose a
> greater risk of nonpayment than solvent
> commercial borrowers, the approach then
> requires a bankruptcy court to adjust the
> prime rate accordingly.    The appropriate size
> of that risk adjustment depends, of course, on
> such factors as the circumstances of the
> estate, the nature of the security, and the
> duration and feasibility of the reorganization
> plan.

Id. at 478-79.    The Court did not decide the proper scale for the
risk adjustment, but did observe that "courts have generally
approved risk adjustments of 1% to 3%" and that the courts should
"select a rate high enough to compensate the creditor for its risk
but not so high as to doom the plan."    Id. at 480.

The formula approach as articulated in Till is utilized in
this district in determining the interest rate required in order to
provide present value to secured creditors under section
1325(a)(5)(B)(ii).    See In re Shaw, 341 B.R. 543, 547 (Bankr.
M.D.N.C. 2006).    Guided by the methodology described in Till
involving the use of the national prime rate with a risk
adjustment, a presumptive Till interest rate is originated by the

- 8 -

chapter 13 trustees which is reviewed quarterly and, if appropriate, adjusted for any changes that may be indicated. When the petition in this case was filed, the <u>Till</u> rate stood at 5.25% based upon a national prime rate of 3.25% with a 2% upward adjustment for risk. In the absence of an objection, the presumptive <u>Till</u> rate is utilized in the chapter 13 cases in this district as the rate for providing present value to secured creditors. If there are objections, the objections are heard and determined before an interest rate is set in the case.

Although the present case involves unsecured claims under section 1325(a)(4) rather than secured claims under section 1325(a)(5)(B)(ii) as was the case in <u>Till</u>, this court believes that the formula approach described in <u>Till</u> is the appropriate approach to determining the rate of interest required in this case to provide the unsecured creditors with the present value of their claims. See <u>In re Hoskins</u>, 405 B.R. at 588 ("Assuming that the Debtors can submit a confirmable plan, as of the effective date of that plan, the Debtors shall propose to pay [the unsecured creditor] a rate of interest equivalent to the prime rate, plus a risk adjustment factor, if appropriate, consistent with <u>Till v. SCS Credit Corp.</u>"). Accord 8 <u>Collier on Bankruptcy</u> ¶ 1325.05[2][b] ("The principles followed in calculating present value interest under section 1325(a)(4) should be similar to those followed under section 1325(a)(5), because both sections share the goal of

compensating creditors for a delay in payments they would otherwise receive immediately."). Contra In re Smith, No. 09-06440-8-RDD, 2010 WL 1533370 (Bankr. E.D.N.C. April 15, 2010).

While this case involves a different section of the Bankruptcy Code than was involved in Till, the operative language of the two sections is practically identical. Both sections require that "the value, as of the effective date of the plan, of property to be distributed under the plan" on account of the claim not be less than the amount the creditor is entitled to receive on account of the claim. As the Supreme Court observed in Till, it is likely that "Congress intended bankruptcy judges and trustees to follow essentially the same approach when choosing an appropriate interest rate under any of these provisions [requiring a present value determination]." 541 U.S. at 474. Moreover, utilizing the Till methodology in this case is consistent with the Till plurality favoring "an approach that is familiar in the financial community and that minimizes the need for expensive evidentiary proceedings." Id. Utilization of the "prime plus" or formula approach from Till in this case also is consistent with the Court's rationale that the formula approach was appropriate because it depended "only on the state of the financial markets, the circumstances of the bankruptcy estate, and the characteristics of the loan, not on the creditor's circumstances or its prior interactions with the debtor." Under this rationale, the fact that unsecured creditors rather than a

secured creditor are involved arguably might have a bearing on the risk assessment, but would not appear to be a basis for abandoning the formula approach and its methodology of starting with the prime rate of interest and adjusting that rate for risk as described in Till.

In his proposed plan, the Debtor proposed post-confirmation interest at an interest rate of 0.34% to unsecured creditors apparently based upon the contention that the federal judgment rate provides a means for selecting an interest rate that complies with the present value requirement of section 1325(a)(4). Based upon the foregoing discussion, this contention was rejected and confirmation of the Debtor's plan as proposed was denied on the grounds that the interest proposed in the plan was insufficient to provide unsecured creditors with the present value of their claims as required under section 1325(a)(4). The Debtor then modified his plan to provide for post-petition interest of 0.34% per annum and post-confirmation interest of 5.25% per annum to unsecured creditors. With this modification, the Debtor's plan complies with section 1325(a)(4) and can be confirmed. A separate order so providing shall be entered upon the filing of this memorandum opinion.

This 28th day of July, 2010.

William L. Stocks

WILLIAM L. STOCKS
United States Bankruptcy Judge

- 11 -

PARTIES IN INTEREST


Terry D. Fisher, Esq.
P.O. Box 1452
Durham, NC 27702

Richard M. Hutson, Trustee